The next case is 2011-2002 ATLANTIC RESEARCH v. TROY Your Honor, I think I'll be pretty brief here on this issue of invalidity. The issue goes to what does the word support mean. Now, we proposed it means bear, wait, or hold up. The judge reads it and adds completely or wholly, or partially or completely, excuse me. Now, we have a problem. Let me ask you something. You're now saying that you completely agree that the spec doesn't disclose a one-point attachment, is that right? Right. Now, obviously that's inconsistent with what you argued below when you were citing expert testimony to the contrary, correct? No. In the response to their motion for summary judgment, you have pages of testimony that you cite from your expert saying that it clearly discloses a one-point attachment. The patent, I think it's undisputed at this trial, which is a trade secret trial, that the patent did not disclose. All right. All right? We've got patent issues, we've got trade secret issues. Right. Let's talk about the patent issue. Okay. In your patent case, you argued below in response to the summary judgment motion. I can pull it out if you want. You cite page after page of expert testimony. How about how you argued that it disclosed a one-point attachment? And you're now admitting in your brief here that it doesn't. That's correct. So do you now agree that you couldn't establish infringement under your patent since the allegedly infringing device, I understood, has a one-point attachment and there's no dispute over that? Do I agree that I cannot establish infringement? Yes. No. Okay. And obviously you want to know why. Yes. Right. And that's the difference between trade secrets and or patents. If, for example, we take the district court's claim construction as it exists today, and she construed the claim to say that support means, et cetera, hold up partially or completely. All right? A, that patent's valid. Why is that valid? Because in the patent it's undisputed that there is a disclosure of partially supporting it. It's undisputed if you apply the word or. My appeal here is that she applied when she actually applied the claim. And Judge Sarris is a very good judge. I've tried many cases in front of her. But she applied the claim with the and, reading into the claim the fact that it has the completely limitation. Maybe part of the problem is that you were doing the same thing to her that you're doing to us, which is you're arguing out of both sides of your mouth. So you argued below that it did show a one-point attachment, and you're arguing here that it does not. So what I'm trying to understand is the relevance. Are you trying to save your patent from an invalidity but are agreeing that you can't establish infringement on a one-point attachment? I'm trying to save the patent from validity because I believe that her claim construction and application of that claim construction saying that my patent is indefinite slash best mode problem is fundamental error. Because she didn't even apply her own claim construction. If you applied her claim construction, there is no basis for that summary judgment motion. Now, I know what you're getting at. What you're getting at, and first of all, at the trade secret trial, the position was that it was not disclosed in the patent. That's that. I understand where you're coming from vis-a-vis the summary judgment, which was alternatively pled and argued. It was on that issue. But the point is now the question you are really asking me is, okay, the patent is held valid. The patent is now reversed a decision. It goes back, and now the question is, is there an infringement? That's what you're asking me. Yes. And you're asking me, then, how can it be? Now, I figured that was going to be the question of the day, so to speak. First of all, we haven't got there. I'm only here to get the patent held valid. But secondly, if we do get there, you can indeed have that single attachment can be an infringement. And let me tell you exactly why. Because the question is, what's the invention? Now, analogies, as we all know, can bite you. And I'm going to give it a try, and if it bites me, so be it. But let's assume we have an airplane. Orville Wright invents the airplane. Before him, all we have is birds. He then claims a machine for flying, period. On the way to the patent office, he thinks about a jet engine. And he invents a jet engine. He doesn't disclose the jet engine in the patent. Okay? He keeps the jet engine as a trade secret. Let's assume he did that. Later on, someone puts a jet engine on a plane. Can he sue him? Absolutely. Why? Because his invention is not his invention is a flying machine. It's not a flying machine with a jet engine that can maneuver around. I'm not sure I appreciate or understand the analogy. But bringing it back to our case, if the claim here, you're acknowledging that the claim here covers just a single attachment. Right? That's your position, because how else could you go for infringement unless it was the single attachment, correct? The claim as written would. Just read it, it would. Sure. And as I understand, what happened below was that the district court said, you haven't supplied a sufficient written description in the specification to cover a single attachment. Do you disagree with that? Is there something in the specification that would adequately describe the single attachment? No. There's not? I agree wholly with the judge's conclusion that the specification does not wholly. But if you look at her claim construction, this is hers, she says partially or, one or the other. So, therefore, the question, you don't have to disclose every embodiment in the world to effectively have an infringement. That's not a requirement. Can I ask one more question? How do you differentiate between Claim 11 and Claim 31? They were both added in the re-exam and their respective dependent claims. What's the distinction? That's a good question. I haven't thought of it. I thought of 11. I can't really give it any thought. I mean, if there's something in 11 that they were both, you are right, both were added in re-examination, which, by the way, when we talk about this, that's not an inconsequential issue of thought because this claim was broadened in re-examination. This claim was broadened in re-examination. Yeah, well, it's interesting because the only declaration says you were going to go in because you thought that Claims 1 through 6 were too narrow, and all of a sudden Claims 1 through 6 remain exactly as they were, and you rewrite Claims 11 and 31 or add 31. Well, that's how they do it. It's unclear from the prosecution history why the examiner allowed this. Because the examiner appreciated that the claims, as granted, were narrower than, in fact, what the patent attorney put the invent on. But you don't have to get rid of the first one. What were you trying to add? If you weren't trying to add a one-point attachment, what were you trying to add in re-exam? What they were trying to add had to do with the beefing up of the yoke. That's what they were trying. They were trying to focus the invention on the yoke as opposed to not. And, by the way, let me just end with this so that if you can grab my airplane analogy. His arms is the first one ever to support a hand guard with a barrel nut, period. Now, not solely, partially, or whatever. He's the first. He's the oval right, so to speak, in this business, so to speak, in that analogy. So if that makes any sense to you. But you can, indeed, have trade secrets, and this treaty's written on this, trade secrets and patents, and they can all exist. And I think the issue here, that's going to be an issue, by the way, for Judge Saris after this, because I think the sole issue before this court is, is her claim construction correct? And on its face, it's absolutely incorrect. It's applied incorrectly. And if it's correct, then the patent is not invalid vis-a-vis written description because the R is there, and it's undisputed that, indeed, there is support in the patent for partially holding it up. No question about that. That's undisputed by everybody. So I would ask that, A, if you do adopt her construction, then you must submit respectfully that you must vacate her summary judgment motion of invalidity, send it back, and then we will have this treaty's written vis-a-vis the interplay between trade secrets, patents, and infringement. But that's not before this court, not even close on this appeal here. You're into your rebuttal time. You want to save the remainder? No, I'm going to have to say something on the, because this is a cross appeal, so. Yes, so you've got three minutes, just under three minutes remaining, and why don't we hear from the other side? Okay, yes, Your Honor. Now, you all have split your time as well. Yes, we have, Your Honor. So you've allotted, are you Mr. McNulty or Mr. LaFleur? I am Mr. McNulty, and I'm intending to speak on the patent issues, and Mr. LaFleur. And you've got four minutes? Okay. Okay. So why don't you address Mr. Hayes' argument with respect to the claim construction and how the claim construction had an or there so it could cover either one, so that it ought to be okay under written description. The one thing Mr. Hayes does not do is indicate how his proposed construction would result in any difference in scope from the construction that the court arrived at. The court made clear, the district court, excuse me, made clear that it was applying the plain meaning that ARMS sought. And they were employing the full meaning of support. It could be partial. It could be complete. That's the scope of support. Yeah, but she said either or in her construction that you did not appeal, so the question is, is there a problem with the fact that she interpreted her own construction to require complete support? No, it's bedrock patent law that the written description, I'm sorry, the specification to meet the written description requirement must demonstrate that the inventor was in possession of the full scope of the claims at issue. Mr. Hayes, I believe, acknowledged that under ARMS' proposed interpretation, the full scope would include single point attachment. Therefore, the specification must demonstrate that the inventor was in possession of single point attachment. So you're saying even though her claim construction was in the or, that both sides of that or had to be met by the specification, had to be covered by the specification? Yes, that's what I'm saying. I can give you some case law on that effect. It was in our summary judgment brief, but I don't know that it made it into our appeal brief. But the ICU medical case, it's 558F3D1368. The Chiron Corp case, 363F3D1247. And the Liebel-Flarsheim, I have no idea if I'm pronouncing that correctly, case, 481F3D1371. In each of these cases, the court determined that the full scope of the claims must be supported by the specification. I'm trying not to use the word support in the two different contexts here. There must be a written description in the specification of the full scope of the claims. Isn't this somewhat backward, though, from the way we often approach this? I mean, couldn't you argue that as you did below that the claim construction actually should only show partial support because the specification doesn't show complete support with a one-point attachment? Well, the problem with that is the claim language itself is not ambiguous. We were actually trying to get the receiver sleeve limitation read into the upper handguard part, which would have been a second point of attachment. We don't need to find that the claim language is ambiguous in order to look at the rest of the specification. That's pretty basic principle. Normally, the court should not construe a claim to assert an invention that's not disclosed anywhere in the specification, right? Actually, under the Phillips v. AWH Corp case, 415 F3D 1303, and the particular language is at 1327-8, this court specifically identified that the duty to preserve claims or the doctrine of construing claims to preserve the validity is only applicable in cases which after applying all the available tools of claim construction, the claim is still ambiguous. Where the claim term at issue is not ambiguous, the doctrine of construing claims to preserve their validity has no applicability. That's not the doctrine I'm talking about. I'm talking about the doctrine that says you got to look at the specification to see what the invention is. Okay. Is that irrelevant to the claim construction analysis? That is not irrelevant, but if you look to the specification, the term support is used to refer to both partial and complete support. So in terms of construing, I'm sorry, construing of the word support, the specification itself identifies the sleeve is self-supported by connection to the rear portion, underside to the receiver top. They're referring to complete support there. The background referring to the prior art talks about the requirement that gun barrels be extra heavy to support the added weight attached by means of collars. They're referring to complete support of these collars and the things that are attached to them. In the summary itself, where ARMS intended for support to be limited, they used a limiting term. They refer to additional support that may be provided by the addition of a special yoke. They recognize the need to put in a term to modify support so that it was not complete support. They did not do so in the claims. And actually to address your question to Mr. Hayes, the distinction between claim 11 and claims 31 to 36 is that claim 11 specifically recites the receiver sleeve. Claims 31 to 36 do not. I think you've exhausted your portion of the time. Why don't we turn to your colleague, Mr. LaPlaca. Is it your job to do the cross appeal here? Yes, it is your honor. May it please the court. The central issue on the trade side, secret side of the cases, whether the district court erred in finding in her state court rulings that ARMS created a hand guard, a single point attachment hand guard on January 20, 1999. In other words, one that attached only to the barrel nut of the weapon for support. And we claim that she did air because she ruled before trial that if the only trade secrets were clamped into the barrel nut, ARMS loses. And she made that ruling on the specific representation of ARMS three weeks before trial. But if you look at the entire context of her discussion, what she said was if the only thing you're claiming is a trade secret is disclosed in the two, four, five, then you lose. That's right. That's right. You, you take a few sentences out of context and try to make that a broader statement. But, but all she was talking about was the two, four, five, not, not the later patent, not the reissue. That's right. But what she's saying is, is, is that the, uh, if your trade secret is just the clamping mechanism, then that's, that's not a trade secret. You've got to give me the more. And then they said, well, the more is the, the, uh, machining techniques, the more is, uh, the, how to attach, uh, uh, uh, attachments to it and different things such as that. She said, that's what I'll be looking for at the actual trial. So consistent with that ruling at trial, ARMS introduced only evidence of a two point attachment hand guard. The two witnesses were Mr. Swan and Sergeant Major Breras. And they each gave, uh, physical demonstrations of the hand guard. And we cite at length their testimony, uh, in our briefs. And we also, uh, gave the court, uh, the, uh, the videotape testimony of Sergeant Major Breras where he says the, uh, receiver sleeve is an integral part of the, uh, the hand guard of the 1999 prototype, which was developed in the basement on January 20th, 1999. But Swan's testimony specifically talks about attaching only to the barrel nut, um, that would allow a, a complete support, free float support by single attach, single point attachment. So his testimony didn't just disclose the two point attachment. He said, this is what I have, but he didn't show that to the jury. Because the only evidence he showed to the jury is, is the receiver is an integral part of the 1999 prototype. And he gave a demonstration of that. He actually got off the, the, the seat and he showed the, how the receiver sleeve goes over the top of the hand guard. But you're really just asking us to, to disagree with the jury here. I mean, the jury had the 245. The judge told them that if the only thing that was the, that he didn't disclose was in the 245, he loses. And the jury still found in, in his favor. So. Well, I'm not asking them to disagree with what the jury did. I'm asking them to disagree with what the judge did. We think the judge should have never allowed that to go to the jury. Because one, she ruled that the attaching the clamp to the barrel and it's not a trade secret. So then they introduced a two point attachment. And then all those other things, the more, which were the, the process had a manufacturing machine, all that laundry list of things. They, they didn't introduce any evidence of them, that they were actual trade secrets. And then they never linked them to anything that Troy had done. They had no evidence of the manufacturing of arms and of Troy. No evidence of that whatsoever. Let me, before your time runs out, let me turn your attention to the mistrial allegations here. I mean, with respect to jury taint, as the district court judge pointed out, you fail to object in any way, shape or form to her plan on how to proceed. Not to timing, not to substance, not to procedure. Why isn't that a sufficient degree of waiver so that you can't come back here now and argue taint? Do you mean on the Allen charge? No, on the other aspect. On the clamp? Yes. Well, she, she didn't take any proactive measures during trial. In fact, she said on the record, I'm not going to do this until after the jury returns. And then after the jury returned, then we found out that the clamp was in the jury room, not that day, but the actual day before. Why didn't you make a record? Why didn't you ask her to immediately call the jury in and make inquiry? Well, we did. And she asked those kind of perfunctory questions in front of each other juror, which said, who brought in the clamp? It was juror number five. Did you talk to the clamp? Yes, we did. Thank you very much. To all 12 jurors. That was after the, after the verdict. That's right. That was after the verdict. No, we're talking about before the verdict. You were aware of this and the judge said, announced how was she planned to proceed. And there was no objection that I could find in the record with respect to how she planned to proceed. Well, there was no instruction that could be given at that point. And she said, I'm not going to do anything until afterwards. That was her decision to make. I won't do anything until afterwards. Well, isn't it your position here that she should have done something before? Well, she should have found out beforehand. Yeah. And so did you suggest that when she was saying, I'm not going to do anything until afterwards, did you say, no, your honor, we request that you do something not. Well, we didn't know at that point that there was an actual, the clamp was in the jury room the day before. Had we known that we would have asked for that, but we didn't know that at the time. Well, neither did she. Right. The only way to have known that would have called the jury in before the verdict. But she had made this specific decision, which she told us on the record, I'm not going to do anything until after the jury verdict. And then she says afterwards, had you asked me, we would have done so. But I thought, well, you've already told us, you're not going to do it until afterwards. That's your decision to make. And we did. That's true of pretty much everything that goes on at the trial level, but it's still up to the parties to object to if they disagree with how the judge is planning to proceed. We think we had objected, at least on the Allen charge, we think we had adequately objected in that point, where she says we didn't think, she didn't think that we did object. But again, had we known the full scope of what the jury was thinking at that time, then we would have made an objection and said, judge, it's been on the jury's mind for the past two days. So there's, there's clearly there's jury taint here. So we've got a problem with this because there is clearly, I think the jury taint. You're saying you just didn't discover that until after the verdict. That's right. That's right. We couldn't have until after the verdict because the, we didn't find out that the jury had actually found out or said that it would, the clamp was in the room the day before. So there's obviously there's a huge problem with this jury verdict. And because I didn't say objection, I want something done right now, I don't think excuse of the fact that we've got a problem with the jury verdict. What is the, what is the tape that you're talking about? The judge, the judge said there wasn't taint. Well, how can you determine that there wasn't a taint on the record that the judge had? Clearly it was on the juror's mind the day before because somebody had brought it in. They talked about it and you can see from the jury notes, I'm sorry. How do we know if they talked about it? Because the, in one of the jury notes, they said a juror brought in the clamp and they, I think they connected to the sympathy and they made that objection because they, somebody had brought the clamp into the room. And clearly it was still on their minds the next day because they still talked about it. There's something in the record indicating that that was related to the sympathy. I didn't see that. I, well, I got to take, I've got to remember what the actual jury question looked like. There were two different points that were being made. One is the clamps in the room and they wanted to know if that was okay to do. And the other was that we think one of the jurors, not necessarily the clamp person. Right. Was basing their verdict or absence of a verdict on sympathy. Right. I think that you can't know what the jury talked about. No doubt about that. But from the actual, the question that they brought it into the room and and the action that was in the room or they talked about the second day, we certainly will never know that or what the specific discussion was, but we do know that the jurors had a hard time with that, with that issue. And we do know that they, they talked about sympathy. Well, you can't connect sympathy to the actual discussion of the clamp. So we think that's a problem with the way the jury rendered the verdict. If there are no other questions, I'd like to reserve the time for rebuttal. Okay. Thank you. We've got a couple of minutes left for rebuttal on the cross appeal. I'll be brief. Your Honor, the trade secret, obviously a question of fact, the judge wrote a 19 page 93, a decision detailing chapter and verse. And my brother's trying to retry a trade secret case all over again. And he's doing it with all due respect by Miss sighting, a quoting and cropping the record here and there, particularly on the Barreras testimony. He brought this as a motion to the district court afterwards, asking for a new trial, the district court on a, I think it's a, uh, what is it? Uh, it's TA 36 addressed it specifically and pointed to where Barreras did corroborate that it was a single attachment, et cetera. And I'm not going to just, I think I waste my time trying to say, obviously there's more than sufficient support on the mass law to say this verdict with respect to my brother's argument of Allen charges, clamps, damages, and all the rest. I think, uh, uh, judge Cyrus did a good job explaining in detail, the rationale and this clamp stuff. What she basically said is he never asked for a corrective instruction. It was a strategy on the Massachusetts law. If you don't ask for a corrective instruction, that's, and that's your strategy because maybe you don't want to upset the jury or whatever, whatever the status is. If you don't do it, you lose it. And that's, that's mass law with regards to my brother's going back. If I have a, just a few seconds going back to, let me ask you about this, uh, about clamp and the inquiry. I mean, the judge specifically asked if you all knew what the procedure was, you've tried cases. I take it for years. You've never had a situation where there was an allegation of, of some improper item being brought into the jury room. Have I had one? Uh, no, I haven't, but I mean, I've seen it happen before. Oh, sure. But I mean, I've tried a lot of cases, a lot of cases, uh, criminal and patents criminal first, but you, you have to, in Massachusetts, if you think there's something wrong, you have to ask the judge on the point to give a corrective instruction. If you don't, and the mass law, which is what we're talking about here, even in the criminal context, if you don't make the objection, then it's, then it is analyzed under a plain error analysis. And, and the first circuit has said that the judge has a duty to inquire and to timely inquire. The, the, the judge, I think, uh, the judge did, I believe, give an instruction relative to this, this clamp, what the issue, what she ruled. And when this issue was brought up, uh, visa via trial on the clamp was that my brother has an affirmative obligation on the Massachusetts law that it thinks if she think if he thinks she did something wrong or wants a corrective instruction to ask her for it. And if he doesn't, he waves it. And the reason he does it is because on the Massachusetts law, it's assumed that that's a strategic move made by him, not so that he can now in an appellate court, save it for, save it for later. It's either you do it or you don't. And that's the, we cited the law and, uh, that's right on. And I think, I think, uh, just Sarah's is right on on that issue. Uh, and the only other question I would like to just briefly, just briefly, uh, talk, talk about this. My brother's, uh, concept, uh, on, on this claim construction issue. I disagree with the citations to the law and that for the reasons I explained in the brief, but we have to take the, the district courts claim construction as written. That's the issue. And, and, and the problem where we asked to go, if you go further and take out the word completely. So you took that out. All right, because she's adding it as an hand, instead of an all the court found that there is no disclosure in this pattern. Supporting a hand guard completely by a barrel nut. No question. No dispute. You want to wrap up your argument, right? So you cannot take that. If there's no extrinsic evidence, you can't read it into a claim and then say, now that I read it in the claims invalid. Uh, that that's fine. Thanks. Thank you. Mr. Hayes, um, on the cross appeal. Um, we'll give you an extra minute. So you'll get. Thank you very much. On the, uh, the clamp issue, uh, we did argue that the, uh, the court does have the duty to inquire. In fact, we, I've not tried a case before where that's ever happened before we're standing around with the rules of civil procedure trying to figure out what to do. Did you tell the, did you tell the judge? No, you better, you've got to bring the jury in now and inquire. I didn't tell her that then. No. And did you object to what she was doing? Did you ask for a curative instruction? No. At that time, there was no curative instruction to be given because we didn't know the scope of, of, of, uh, the, the issue with the clamp, because nobody knew at that time that the clamp was in the room the day before the courtroom. Deputy said, told you all at the time, but that was day three. The, the clamp was in the jury deliberation room on day two. We didn't find that until I was all this conversation going on with the jury. I mean, I've never heard of a case where the judge is being told repeatedly what the jurors break down on their votes is wasn't, didn't the judge instruct the jury never to tell anyone? What their well, but the deputy clerk found out about that. And so everybody knew that the split was nine to one. So the clerk's in there talking to the jury. I don't know the answer to that question. I don't know how he knew the, it was nine to one, but he disclosed that to us that it was nine to one. So we all knew it was. So when did you find out there was a clamp in the room? We found out that before the verdict, right? Uh, yes, before the verdict, but it was on day three of the deliberations. Right. And we, but we, they, we had found out after the verdict that the jury, the, uh, the clamp was actually in the jury room on day two of the deliberations. Well, whether it was there on whether you knew it was there on day three or day two, what difference does that make? Whether or not you said you would have said to the district court, we better make an inquiry here. Well, because clearly it was on the jury's mind a day later. So they were thinking about it, not on the day that it was actually in the room on day two, but they were thinking about it still on day three. So that's a problem. Any final thought times about to run out? Uh, no, you're right. I, I did. I think I made the argument I wanted to make, uh, that the, the laundry list, uh, of the, the more items that arms into argued where, where trade secrets, they never introduced any evidence of those at trial. And remember the judge set the ground rules that by saying, I'm looking for the more, I'm not looking for the clamp. So therefore the only thing that, that the, that was the inquiry was on the more, and they were not trade secrets. We have your point. Thank both. Thank you very much. Okay.